# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RACHEL NUNES<br><br>Plaintiff,<br><br>v.<br><br>TIFFANIE RUSHTON<br><br>Defendant. | MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS IN LIMINE<br><br>Case No. 2:14-cv-00627-JNP-DBP<br><br>District Judge Jill N. Parrish |

Rachel Nunes sued Tiffanie Rushton for copyright infringement, defamation, and a number of additional causes of action. Before the court are cross-motions for summary judgment brought by Rushton and Nunes. Rushton brings a motion for partial summary judgment as to actual damages under the copyright claim and for summary judgment as to the defamation, defamation per se, false light, business disparagement, tortious interference with economic relations, electronic communication harassment, false advertising, and Utah deceptive trade practices claims. [Docket 172]. Rushton also moves to exclude several of Nunes's expert witnesses. [Docket 158, 168, 169, 170, 171]. Nunes seeks summary judgment on her copyright claim [Docket 218], defamation claims [Docket 228], electronic communication harassment claim [Docket 229], false advertising claims [Docket 230], and tortious interference claim. [Docket 231]. Nunes also brings separate motions for summary judgment as to Rushton's insanity defense [Docket 160] and her affirmative defenses of unclean hands, comparative fault, bad faith, failure to mitigate damages, estoppel, and laches. [Docket 161].

The court grants partial summary judgment in favor of Nunes on the issue of liability for copyright infringement and partial summary judgement in favor of Rushton on the issue of actual damages under the copyright claim. The court also grants summary judgment in favor of Rushton on the defamation, defamation per se, false light, business disparagement, tortious interference with economic relations, electronic communication harassment, false advertising, and Utah deceptive trade practices claims. Finally, the court grants Nunes's motions for summary judgment on Rushton's affirmative defenses and denies as moot Rushton's various motions in limine. Thus, the only issue remaining for trial is the amount of the statutory damages award for copyright infringement.

## BACKGROUND

Nunes is a writer who has authored more than fifty novels. She published her novel *A Bid for Love* in 1998. Nunes registered her copyright to *A Bid for Love* with the U.S. Copyright Office on September 8, 1998.

Rushton is also a writer who has published three novels under her pen name, Sam Taylor Mullens. She published her most recent novel, *The Auction Deal*, between May and July 2014 by distributing between 80 and 90 free copies to reviewers and bloggers for promotional purposes. With the exception of the addition of sex scenes, *The Auction Deal* is substantially similar to *A Bid for Love* and shares the same dialog, scenes, characters, themes, settings, and plot.

In May 2014, Rushton created about fifteen "sock puppet" accounts on Google.com, Yahoo.com, Goodreads.com, and Facebook.com. Rushton registered these accounts under usernames that did not identify her as the individual controlling the accounts. Rushton used her sock puppet accounts to post positive reviews of her previous two novels, *Hasty Resolution* and *Hold You Again*. In addition to giving herself positive online reviews, Rushton also posted

negative reviews of Nunes's book. In April 2014, Rushton posted a negative Amazon review of *A Bid for Love* under her own name. In May 2014, Rushton posted three more negative Amazon reviews of *A Bid for Love*, one under her own name and two under sock puppet names.

On August 1, 2014, a reader of both *A Bid for Love* and one of the promotional copies of *The Auction Deal* contacted Nunes and reported that the two novels were very similar. Other readers subsequently contacted Nunes to notify her of the similarities.

After Nunes learned of *The Auction Deal*, she attempted to obtain a copy by requesting it from one of Rushton's sock puppet accounts. In response, Rushton sent Nunes a series of private comments through Goodreads.com. On August 4, 2014, Rushton called Nunes "petty" and her conduct "ridiculous." On August 5, 2014, Rushton called Nunes's behavior "extremely unprofessional and inappropriate" and threatened to start a protest campaign on the sidewalks of bookstores.

Rushton pulled *The Auction Deal* from sale on Amazon.com after Nunes contacted her. Before Rushton stopped selling the book, she purchased two copies for herself. No other copies of the novel were ever sold to the public.

Rushton, however, continued to post negative comments about Nunes and her books. On August 6, 2014, Rushton posted another negative review of *A Bid for Love* under her own name and nine more negative reviews of Nunes's books from sock puppet accounts. Rushton also used sock puppets to give multiple one-star ratings of Nunes's books on Goodreads.com. Rushton made several public comments about Nunes on Facebook, including:

- "I have lost a lot of respect for Rachel Nunes as an author and a person. She harassing [sic] readers/reviewers online. In my eyes, she obviously does not have

the character trait of being kind, caring, understanding or compassionate. I have lost a lot of respect for Rachel. Sad day."

- "Ask your attorneys if in your quest to investigate and have people rally around you if you are guilty of harassment. I think the answer is yes."

- "I have been harassed by Nunes and her assistant for not supplying her with an ARC [advance review copy]."

- "To ask for a copy from reviewers relentlessly is a form of harassment."

- "Nunes was pretty mad when she didn't get her way and then sent her minions after Sam [Rushton's pen name] and reviewers."

After Nunes discovered the identity of the person who had written and published *The Auction Deal*, she decided to sue Rushton. Nunes started a GoFundMe.com fundraiser to finance her lawsuit. Rushton posted several comments on Nunes's GoFundMe.com page using sock puppet accounts, including:

- "A best selling author doesn't need to solicit funds from people. This is fraud!"

- "This is a scam! Ms. Nunes may have a far fetched case with plagiarism, but she is also facing a harassment suit. She needs money for representation since Covenant Publishers will not back her! You need to get your hard earned money back!"

- "This 'fund me' has got to be a hoax or scam. A publisher would be backing this if it were a real claim."

- "This is scam people!"

Nunes subsequently sued Rushton for copyright infringement, defamation, and a number of additional claims. During a deposition, Rushton conceded that she used Nunes's novel as a

starting point for her own novel. Rushton further admitted that she added some material—including sex scenes—deleted some material, changed some of the words from Nunes's novel, and then distributed the resulting novel as her own original work. Rushton also acknowledged that her novel was substantially similar to Nunes's novel.

## APPLICABLE LAW AND LEGAL STANDARDS

A federal court exercising supplemental jurisdiction over state-law claims "applies the substantive law, including choice of law rules, of the forum state." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (citation omitted). Because all of the relevant conduct occurred in Utah, the court applies Utah's substantive law to the claims for defamation, defamation per se, false light, business disparagement, tortious interference with prospective business relations, electronic communication harassment, and deceptive trade practices under the Utah Truth in Advertising Act. Federal law applies to Rushton's copyright infringement and false advertising claims because they arise under federal statutes.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). On a motion for summary judgment, the court "consider[s] the evidence in the light most favorable to the non-moving party." *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (citation omitted). However, "[w]hen the moving party has carried its burden under rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the

5

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original) (citation omitted).

## ANALYSIS

## I.     COPYRIGHT INFRINGEMENT

Both Nunes and Rushton move for partial summary judgment on Nunes's cause of action for copyright infringement. The court addresses each motion separately.

### A. *Nunes's Motion for Partial Summary Judgment*

Nunes seeks summary adjudication on two issues. First, she argues that that she is entitled to a summary adjudication on the issue of liability for copyright infringement because Rushton does not contest that a significant portion of her novel, *The Auction Deal*, was copied from Nunes's novel, *A Bid for Love*. Second, Nunes argues that the court should summarily adjudicate that Rushton's infringement "was committed willfully" within the meaning of 17 U.S.C.A. § 504(c)(2).

#### 1)  Liability for copyright infringement

The owner of a copyright has the exclusive right to reproduce and distribute the copyrighted work as well as the right to prepare derivative works. 17 U.S.C. § 106. "Anyone who violates any of the exclusive rights of the copyright owner as provided by section[] 106 . . . is an infringer of the copyright . . . ." 17 U.S.C. § 501(a). "To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991).

Rushton concedes in her response to Nunes's motion for summary judgment that she copied elements of Nunes's novel, *A Bid for Love*, when she wrote *The Auction Deal* and that she tried to pass Nunes's work off as her own. And Rushton does not contest that *A Bid for Love* was an original work. Rushton argues, however, that Nunes is not entitled to summary adjudication on the issue of infringement for two reasons: (1) Nunes has not proven that she owns the copyright to *A Bid for Love* because the copyright registration she provided must be excluded under Federal Rule of Evidence 602 and (2) Rushton's copying of *A Bid for Love* constituted fair use.

Rushton's objection to Nunes's copyright registration is overruled. Perplexingly, Rushton bases her objection to the document on Rule 602, which provides: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602. The admissibility of witness testimony is not at issue here. Rather, it is the admissibility of a document. Rule 602, therefore, does not apply.[1]

Rushton's fair use argument also fails. Rushton never pleaded a fair use defense in her answer. Because fair use is an affirmative defense, she waived it by failing to plead it. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) ("[F]air use is an affirmative defense . . . ."); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561 (1985) ("The drafters [of section 107] . . . structured the provision as an affirmative defense requiring a case-by-case analysis."); *Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*, 41 F.3d 600, 604 (10th

_____

[1] Moreover, the court takes judicial notice of the fact that Nunes registered her copyright because the information can readily be verified through a search of the U.S. Copyright Office's official website. *See* FED. R. EVID. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")

Cir. 1994) ("Failure to plead an affirmative defense results in a waiver of that defense."). Rushton may not raise the fair use defense for the first time in a motion for summary judgment after the close of discovery.

Because Rushton's arguments fail and there is no dispute of fact as to her liability for copyright infringement, Nunes is entitled to summary adjudication in her favor on this issue.

### 2) Willfulness of Rushton's infringement

"[A]n infringer of copyright is liable for either (1) the copyright owner's actual damages . . . or (2) statutory damages . . . ." 17 U.S.C. § 504(a). The copyright owner may elect to receive statutory damages "any time before final judgment is rendered." *Id.* § 504(c)(1). Ordinarily, statutory damages may be awarded "in a sum of not less than $750 or more than $30,000." *Id.* But if the copyright infringer sustains the burden of proving that infringement "was committed willfully," statuary damages may be awarded in an amount not to exceed $150,000. *Id.* § 504(c)(2). Conversely, "[i]n a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." *Id.*

Nunes asserts that Rushton's infringement was willful as a matter of law. Nunes argues that there is no dispute of material fact on this issue and cites evidence that *The Auction Deal* is a blatant copy, that Rushton has a history of copyright infringement, that she was aware of copyright laws, and that she retaliated against Nunes for defending Nunes's copyright. Notably, however, Nunes does not cite any evidence that Rushton "confessed" that her infringement was willful within the meaning of section 504(c)(2).

As is often the case, Nunes has presented only circumstantial evidence of Rushton's state of mind when she infringed Nunes's copyright. *See DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) ("Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence."); *Borchardt Rifle Corp. v. Cook*, 727 F. Supp. 2d 1146, 1163 n.9 (D. N.M. 2010) ("Rarely is there direct evidence of scienter, and generally scienter is proved by circumstantial evidence."). While Nunes has presented evidence that permits an inference that Ruston's infringement was willful, a permissible inference derived from circumstantial evidence does not eliminate the need for a trial on the issue of Rushton's scienter. Indeed, "[s]ummary judgment is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." *Helf v. Chevron U.S.A. Inc.*, 361 P.3d 63, 75 (Utah 2015) (alteration in original) (citation omitted). Moreover, there is at least some evidence that Rushton believed that she had not infringed Nunes's copyright. In an email to Nunes, Rushton insisted that she could not be held liable for infringement because, in her mind, she never published *The Auction Deal* by selling copies to the public.

Accordingly, the issue of whether Rushton's infringement was willful may not be resolved on summary judgment. The court denies Nunes's motion for summary adjudication on the issue of the willfulness of Rushton's infringement.

### B.  *Rushton's Motion for Partial Summary Judgment on Actual Damages*

Nunes claims that she is also entitled to actual damages resulting from Rushton's infringement. But Nunes does not argue that the infringement caused the sales of her existing novels to suffer. Nor does Nunes contend that Rushton obtained any ill-gotten gains that must be disgorged because Rushton never sold any copies of her infringing novel to the public. Instead,

Nunes alleges that Rushton's copyright infringement caused her mental anguish. She further contends that this mental state prevented her from writing for a period of time and that she lost the benefit of two novels that she would have otherwise written during this timeframe. Nunes asserts that she is entitled to the revenue these two unwritten novels would have generated as actual damages for copyright infringement.

Rushton moves for partial summary judgment on Nunes's claim for actual damages. Rushton argues, among other things, that the actual damages claimed by Nunes stem from her emotional distress and that the Copyright Act of 1976 does not permit the recovery of emotional distress damages as actual damages.

The Copyright Act's actual damages provision states: "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). The question before the court is whether the term "actual damages" as used in this statute includes damages caused by the copyright owner's emotional response to the infringement.

The U.S. Supreme Court has held that the term "actual damages" cannot be given a universal definition applicable to all federal statutes. *FAA v. Cooper*, 566 U.S. 284, 292–94 (2012). The Court noted that the term has been understood by some courts to include compensation for emotional distress in the context of the Fair Housing Act and the Fair Credit Reporting Act. *Id.* at 292–93. "In other contexts, however, the term has been used or construed more narrowly to authorize damages for only pecuniary harm." *Id.* at 293. Thus, lower courts have defined "actual damages" in the Copyright Act of 1909 and the Securities Exchange Act of

1934 to include only economic injury.[2] *Id.* "Because the term 'actual damages' has this chameleon-like quality, [courts] cannot rely on any all-purpose definition but must consider the particular context in which the term appears." *Id.* at 294.

This court, therefore, must first look to the language and context of the Copyright Act of 1976 to determine whether the term "actual damages" encompasses emotional distress damages. The language and structure of 17 U.S.C. § 504 indicate that the Act provides for only economic damages. Subsection (a) states that an infringer is liable for "the copyright owner's actual damages and *any additional profits* of the infringer." 17 U.S.C. § 504(a) (emphasis added). Subsection (b) further explains that a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." *Id.* § 504(b). This language clarifies an ambiguity found in the Copyright Act of 1909 by explicitly stating that a copyright holder may recover both the economic loss caused by the infringement and the economic gain obtained by the infringer, but only to the extent that double counting is avoided. 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 14.01[A] (Rev. Ed. 2017). "Where the defendant's profits are nothing more than a measure of the damages suffered by the copyright owner, it would be inappropriate to award damages and profits cumulatively, since they amount to the same thing." *Id.* (quoting the House Report for the Copyright Act of 1976, H.R. Rep. No. 94-1476, at 161 (1976)). Within this rubric, the "actual damages" suffered by the copyright owner and the profits reaped by the infringer are two sides of

---

[2] Although the Supreme Court cited Ninth Circuit caselaw stating that "hurt feelings" are not compensable under the Copyright Act, it did not explicitly endorse this proposition. Thus, *FAA v. Cooper* may be read to suggest that the Court might agree with the Ninth Circuit, but the opinion does not definitively resolve this legal question.

the same coin. Thus, the explicit provision for the recovery of the infringer's economic profits in the Act strongly suggests that the copyright owner's "actual damages" must similarly be economic in nature.

Caselaw interpreting the damages clause of the Copyright Act of 1976 confirms that emotional distress damages are not compensable. Circuit courts have held that the phrase "actual damages" means the copyright owner's economic loss caused by infringement. *See, e.g., Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1118 (2d Cir. 1986) ("Although the Act itself does not define what constitutes actual damages, the primary measure of recovery is the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement."); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985) (quoted by *FAA v. Cooper*, 566 U.S. at 293) ("'Actual damages' are the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement."). Although few courts have specifically addressed the question of whether emotional distress damages can be awarded as damages under the Copyright Act of 1976, the courts that have addressed the question have answered in the negative. In *Mackie v. Riser*, for example, the Ninth Circuit held that "hurt feelings" have no place in the actual damages calculus for a Copyright claim. 296 F.3d 909, 917 (9th Cir. 2002). Additionally, in *Stern v. Does* a copyright plaintiff sought damages for emotional distress, insomnia, and other stress-related ailments, such as pain and loss of mobility in his hip. 978 F. Supp. 2d 1031, 1050 (C.D. Cal. 2011). The court ruled that "[t]heir dubiousness aside, none of these claims are compensable under the Copyright Act." *Id*. Finally, *Kelley v. Universal Music Group*, No. 14 Civ. 2968(PAE), 2015 WL 6143737 (S.D.N.Y. Oct. 19, 2015) is particularly relevant to the present case. The plaintiff if *Kelley* claimed that the alleged infringement of a song that he helped to write caused

him to experience mental anguish. In particular, the plaintiff alleged that he "suffered from feelings of distress, anxiety and depression, which interfer[ed] with his creative ability, hinder[ed] his inspiration to write and consequently stagnate[d] his income." *Id.* at *6. The *Kelley* court dismissed the emotional distress claim, ruling that the plaintiff's emotional distress and stress-related ailments arising from the alleged infringement are not compensable under the Copyright Act.[3] *Id.* at *7.

Finally, courts have also looked to the purposes animating a particular statute when deciding whether the term "actual damages" includes emotional distress damages. For example, in determining that the actual damages provision of the Fair Credit Reporting Act (FCRA) provided for emotional distress damages, courts have noted the Act's objective of protecting consumers. *See Johnson v. Department of Treasury, IRS*, 700 F.2d 971, 984 (5th Cir. 1983) ("[I]n the Fair Credit Reporting Act, Congress specifically found that there was "a need to ensure that consumer reporting agencies exercised their grave responsibilities with . . . a respect for the consumer's right to privacy." (alteration in original)); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("These consumer oriented objectives [of the FCRA] support a liberal construction of the FCRA"). Similarly, in *Anderson v. United Finance Co.* the term

---

[3] In *Smith v. NBC Universal*, a district court dismissed an emotional distress claim for copyright infringement but expressed a willingness to entertain such a claim in a hypothetical situation where emotional distress harm was foreseeable, such as where a defendant distributes a copyright owner's private documents without consent. No. 06 Civ. 5350(SAS), 2008 WL 483604, at *1–*2 (S.D.N.Y. Feb. 22, 2008). The *Smith* court based its reasoning on the historical reference in *Harper & Row Publishers, Inc. v. National Enterprises*, 471 U.S. 539, 554 (1985) that "common-law copyright was often enlisted in the service of personal privacy." Thus the *Smith* court ruled that it was the unauthorized publication of a private work—such as a diary—that could warrant emotional distress damages, not the infringement of the right to produce copies of a published work. In this case, as was the case in *Smith*, the infringer did not publish a private work. Thus, even if *Smith* were correctly decided, it would not support emotional distress damages in this case.

"actual damages" under the Equal Credit Opportunity Act (ECOA) was interpreted to include damages for "mental anguish, humiliation or embarrassment." 666 F.2d 1274, 1277 (9th Cir. 1982). In so holding, the Ninth Circuit pointed out that "[t]he purpose of the ECOA is to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." *Id*. Furthermore, *Seaton v. Sky Realty Co.* held that the actual damages provision of the Fair Housing Act authorizes damages for humiliation, noting that the plaintiff in that case "was subjected to a racial indignity which is one of the relics of slavery which 42 U.S.C. § 1982 was enacted to eradicate." 491 F.2d 634, 636 (7th Cir. 1974).

No such purpose to protect consumers, prevent discrimination, or eradicate racial prejudice can be attributed to the Copyright Act. Thus, the policy considerations that some courts have relied upon to hold that statutory actual damages provisions encompassed emotional distress damages do not apply to 17 U.S.C. § 504(b).

For the foregoing reasons, the court agrees with the result achieved by the *Mackie*, *Stern,* and *Kelley* decisions and concludes that those cases are consistent with the language and context of the Copyright Act of 1976. Copyright holders may not recover emotional distress damages caused by infringement. In this case, Nunes seeks compensation for her emotional distress as actual damages under the Copyright Act. Her claim for lost sales for the two unwritten books is based entirely upon her assertion that Rushton's infringement caused her emotional distress, which prevented her from writing the two novels. These claimed emotional distress damages may not be recovered under the actual damages provision of the Copyright Act. *See Kelley*, 2015 WL 6143737 at *6 (rejecting a claim for lost income where the plaintiff claimed that copyright infringement induced anxiety and interfered with his creative process). Because Nunes has not

presented any evidence of compensable actual damages, the court grants Rushton's motion for partial summary judgment on the issue of actual damages.

### C. Issues Remaining for Trial

In summary, the court concludes that Rushton is liable for copyright infringement and that Nunes's claim for actual damages fails as a matter of law. The only copyright issues that remain to be resolved by the jury are whether the infringement was willful and the amount of the statutory damage award. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998) ("[W]e hold that the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself.").

## II.    DEFAMATION

Nunes also asserts a defamation claim based on Rushton's online comments and emails. These comments and messages can be divided into four categories. First, Rushton posted comments expressing her opinions about Nunes's books and personality traits. Second, Rushton posted comments that characterize Nunes's actions as either "harassment" or "fraud." Third, Rushton posted comments containing false assertions of fact. And fourth, Rushton sent two unpublished communications directly to Nunes.

"To state a claim for defamation, [a plaintiff] must show that [the defendant] published the statements concerning him [or her], that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994) (footnotes omitted). Both Nunes and Rushton move for summary judgment on the

defamation claim. In determining whether summary judgment is appropriate, the court analyzes separately each of these four categories of comments.

A. *Statements of Opinion*

Important protections to free speech provided by the First Amendment and article I, section 15 of the Utah Constitution limit liability for defamation. *Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005) ("Defamation claims always reside in the shadow of the First Amendment."); *West*, 872 P.2d at 1015 (holding that the Utah Constitution limits liability for defamation). Specifically, the Utah Constitution protects expressions of opinion from defamation liability. "Because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability." *West*, 872 P.2d at 1015. In contrast, "[a]ssertions of fact, being objectively verifiable and much more capable of harming reputation, are not entitled to the same degree of protection afforded expressions of opinion." *Id*. Thus, in order to prove a defamation claim, a plaintiff must show that the defendant stated or implied facts that are both false and defamatory. *Id.*

Rushton's comments about Nunes's books and personality traits are constitutionally protected expressions of opinion. For example, Rushton posted several critical reviews of Nunes's novels, opining that they were "out of date and ridiculous." Rushton also called Nunes "petty" and "ridiculous" and stated: "In my eyes, [Nunes] obviously does not have the character trait of being kind, caring, understanding or compassionate." Rushton further asserted that Nunes engaged in "unethical" conduct by asking reviewers for a copy of Rushton's book, *The Auction Deal*. Such comments about the quality of Nunes's books, her character traits, or her conduct are opinions that cannot be proven true or false. As opinions, these comments cannot support a claim for defamation.

16

*B. Statements Alleging Fraud or Harassment*

Rushton also posted a number of online comments that cannot as easily be categorized as opinions. First, Rushton posted comments accusing Nunes of perpetrating a "fraud" or a "scam" on Nunes's GoFundMe webpage:

- "A best selling author doesn't need to solicit funds from people. This is fraud!"

- "This is a scam! Ms. Nunes may have a far fetched [sic] case with plagiarism, but she is also facing a harassment suit. She needs money for representation since Covenant Publishers will not back her! You need to get your hard earned money back!"

- "This 'fund me' has got to be a hoax or scam. A publisher would be backing this if it were a real claim."

- "This is scam people!"

Second, Rushton described Nunes's messages to herself and to other reviewers requesting a copy of *The Auction Deal* as harassment. Rushton posted online comments that Nunes "harass[ed] readers/reviewers online," that Rushton was "harassed by Nunes and her assistant for not supplying" materials related to the unauthorized use of her book and that Nunes needed to consult her attorneys about whether she was "guilty of harassment."

These comments did not ascribe to Nunes any acts other than those Nunes actually performed. Nunes launched the GoFundMe online fundraising campaign and requested copies of *The Auction Deal* from reviewers. The issue is Rushton's characterization of those acts and whether any factual inferences can properly be drawn from her statements. In other words, should Rushton's use of the terms "fraud," "scam," or "harassment" be read as an expression of a

strong negative opinion regarding Nunes's actions, or should it be interpreted as an assertion of fact that Nunes committed criminal acts of fraud or harassment.

In determining whether Rushton's statements constitute protected opinions or potentially actionable assertions of fact, the court must look to the content and context of the messages. In *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, for example, the U.S. Supreme Court held that the use of the term "blackmail" to characterize a position taken in negotiations with city officials did not amount to an accusation of a crime. 398 U.S. 6, 13–14 (1970). The Court analyzed the elements of the crime of blackmail and reasoned that the defendant never indicated that the plaintiff had engaged in conduct approximating criminal blackmail. *Id.* at 14 n.7. Instead, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." *Id.* at 14.

The Utah Court of Appeals has also addressed this issue. In *Westmont Residential LLC v. Buttars*, a defendant "posted a review in an online forum describing [his landlord] as 'crooks' that 'will take full advantage of you!'" 340 P.3d 183, 185 (Utah Ct. App. 2014). The *Westmont* court "acknowledge[d] that [while] the term 'crooks' can carry a criminal connotation, in the context of Defendants' online review, the term is clearly not being used in this manner." *Id.* at 189. The court held that that the use of the term "crooks" was nothing more than rhetorical hyperbole. *Id*. Other states use a similar approach to differentiate opinion from factual assertions. In *Hodgins v. Times Herald Co.*, a Michigan court emphasized the difference between non-actionable exaggerated language used to express an opinion ("blackmailer," "traitor" or "crook") and a factual accusation of selling dogs to persons who use them in dog fights, a state crime. 425 N.W.2d 522, 527 (Mich. Ct. App. 1988). As *Hodgins* recognized, "[t]here is no First

Amendment protection for 'a charge which could reasonably be understood as imputing specific criminal conduct or other wrongful acts.'" *Id.* (citation omitted).

There is no indication that Rushton imputed specific criminal conduct to Nunes by referring to Nunes's litigation fundraising as a "fraud," "hoax," and "scam." The Utah Criminal Code lists numerous offenses under the umbrella of "fraud." UTAH CODE §§ 76-6-501 through -524. But perhaps the broadest form of criminal fraud can be found in the communications fraud statute, which makes it is a crime to "devise[] any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and [to communicate] directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice." Utah Code § 76-10-1801. Rushton did not accuse Nunes of soliciting money through false representations. Rushton, for example, did not allege that Nunes was pocketing the money she raised on the GoFundMe website instead of using it to fund her litigation efforts. Instead, Rushton implies that a bestselling author like Nunes should not request money from others to fund a lawsuit, stating: "A best selling author doesn't need to solicit funds from people. This is fraud!" Rushton also questions the strength of Nunes's legal claims by calling them "far[-]fetched" and by reasoning that her publisher would be funding the lawsuit if Nunes had a legitimate legal case. In the context of these statements, readers would understand the use of the terms "fraud" and "scam" as exaggerated language expressing strong disapproval of Nunes's efforts to raise money online, not as a charge of criminally fraudulent activity.

Similarly, Rushton's online comments regarding harassment do not accuse Nunes of specific criminal conduct. In Utah, "[a] person is guilty of harassment if, with intent to frighten or harass another, he communicates a written or recorded threat to commit any violent felony."

UTAH CODE 76-5-106. Rushton did not accuse Nunes of threatening to commit a violent felony in order to frighten or harass another. Rather, Rushton stated that Nunes had asked herself and others for a copy of *The Auction Deal* and labeled this conduct as harassment. Taken in context, readers of the comments would have understood that Rushton was expressing her opinion that Nunes's actions were overly aggressive, not that Nunes had committed actions that would constitute the crime of harassment.

Even Rushton's comment that Nunes needed to consult her attorneys about whether she was "guilty of harassment" does not assert that Nunes committed criminal acts. Rushton posted the following on Nunes's public Facebook account:

> Ask your attorneys if in your quest to investigate and have people rally around you if you are guilty of harassment. I think the answer is yes. My LDS mom and grandmother have seen all the posts today and do not feel you are acting in accordance to gospel guidelines or in a Christ-like manner.

Rushton's comment can certainly be read to express a legal opinion that Nunes was guilty of "harassment." But opinions about the legal significance of Nunes's actions, even opinions that are questionable, are not actionable as defamation. Moreover, the comment does not allege or imply that Nunes committed any specific criminal acts. This comment was posted in the context of a debate among individuals commenting about the copyright infringement of Nunes's novel and whether Nunes's efforts to obtain a copy of Rushton's novel were appropriate. In this setting, the reference to Nunes's "quest to investigate and have people rally around you" refers to Nunes's requests to reviewers to send her one of the advanced copies of *The Auction Deal* and her online efforts to sway the romance novel community to side with her in the dispute with Rushton. The facts implied by this comment are not criminal, nor are they false or defamatory.

In sum, terms such as "fraud" and "harassment" found in some of Rushton's online comments would have been understood to be "no more than rhetorical hyperbole." *Greenbelt*, 398 U.S. at 14. Because Rushton did not make factual assertions of specific criminal conduct, these opinions cannot support defamation liability.

### C. Statements of Fact

Rushton also published a handful of messages that contain false statements of fact. For example, Rushton wrote messages to book reviewers and bloggers claiming that Nunes had given her permission to use elements of *A Bid for Love* or that Nunes had co-written *The Auction Deal* with Rushton. Additionally, Rushton posted the following message: "Racheal [Nunes] feels threatened because I told her I would be contacting my aunt, Sheri Dew, and letting her know how she is handling the situation—through reviewers and not through the author. Deseret Book and Seagull Book are appalled at the way she is handling the situation."

Although these statements incorporate assertions of fact, they may support a defamation claim only if the asserted facts are defamatory. *West*, 872 P.2d at 1015 ("[I]f the underlying facts are not defamatory, an action for defamation is improper."). "Whether a statement is capable of sustaining a defamatory meaning is a question of law" that may be answered by a district court before submitting the case to a jury. *Id.* at 1008; *SIRQ, Inc. v. The Layton Companies, Inc.*, 379 P.3d 1237, 1245 (Utah 2016); *O'Connor v. Burningham*, 165 P.3d 1214, 1221 (Utah 2007). Moreover, when a district court determines whether a statement is susceptible to a defamatory meaning on summary judgment, it does not construe all factual inferences in favor of the nonmoving party, as it would in other cases. *O'Connor*, 165 P.3d at 1221–22. The First Amendment demands that the court "conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to

a defamatory interpretation" without "indulging inferences in favor of the nonmoving party." *Id.* at 1222; accord *West*, 872 P.2d at 1009 n.15 (holding that resolving all ambiguities in an alleged defamatory statement in favor of the plaintiff "effectively eviscerates the court's responsibility to determine initially if the statement is defamatory as a matter of law").

"Under Utah law, a statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West*, 872 P.2d at 1008. "[I]n determining whether a particular statement fits within the rather broad definition of what may be considered defamatory, the guiding principle is the statement's tendency to injure a reputation in the eyes of its audience." *Id.* The fact that a plaintiff finds a statement to be "personally offensive . . . does not render it defamatory." *Id.* at 1009. Furthermore a "publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff." *Id.* (citation omitted).

Under this standard, Rushton's false statements to reviewers that Nunes either authorized the use of elements of *A Bid for Love* or collaborated with Rushton in writing *The Auction Deal* are not susceptible to a defamatory meaning. Given that Nunes did not give Rushton permission to use elements of her book or collaborate with her, Nunes may very well have found these statements to be personally offensive. But such statements do not have a "tendency to injure a reputation in the eyes of its audience." *See id.* at 1008. Giving permission to use copyright material or collaborating with another writer does not expose an individual "to public hatred, contempt, or ridicule." *See id.* Therefore these statements cannot support Nunes's defamation claim.

Rushton's false claims that her aunt was the CEO of Desert Book and that Desert Book and Seagull Book disapproved of Nunes's actions are also not susceptible to a defamatory meaning. To state a claim for defamation, a plaintiff "must show that [the] defendant[] published . . . statements concerning him [or her]." *Id.* at 1007. Although Rushton likely intended to intimidate Nunes with these false statements, they do not defame Nunes because they are not about her. The falsehoods concerned Ruston's familial relations and opinions held by two bookstore chains. Even if the statement that Desert Book and Seagull Book frowned on Nunes's actions indirectly concerned Nunes, it is not susceptible to a defamatory meaning. This statement may be nettlesome, but a falsehood concerning an opinion held by a third party is not sufficient to expose an individual to public hatred or ridicule.

### D.  Rushton's Communications to Nunes

Finally, Nunes points to a direct message Rushton sent her over the Goodreads website and an email Rushton sent to her as a basis for defamation liability. In the direct message and the email Rushton repeated her false claim about her relationship with Sheri Dew and accused Nunes of harassment. These electronic communications cannot support a claim for defamation because Rushton did not publish them to a third party. *See DeBry v. Godbe*, 992 P.2d 979, 985 (Utah 1999) ("The requirement of 'publication' means that the defamatory statement be communicated to a third person . . . .").

### E.  Conclusion

Because none of the online statements that Nunes relies upon can support a defamation claim, Rushton is entitled to summary judgment in her favor on this cause of action.

## III.    DEFAMATION PER SE

In addition to her defamation claim, Nunes asserts a separate cause of action for defamation per se based upon Rushton's online comments. Both Nunes and Rushton move for summary judgment on the defamation per se claim.

Because all of the statements made by Rushton were written, Nunes's cause of action is properly categorized as a libel per se claim. *See Jacob v. Bezzant*, 212 P.3d 535, 545 (Utah 2009). "Libel is classified per se if it contains 'defamatory words specifically directed at the person claiming injury, which words must, on their face, and without the aid of intrinsic proof, be unmistakably recognized as injurious.'" *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 977 n.7 (Utah 1981) (citation omitted). If a plaintiff can prove that a writing is defamatory per se because it is it is unmistakably injurious, he or she is relieved of the obligation to prove special damages. *Id.*

Although establishing that a written statement is libelous per se obviates the need to prove special damages, it does not eliminate constitutional limitations to defamation claims or otherwise modify the elements of a prima facie cause of action for defamation. As noted above, many of Rushton's statements are constitutionally protected opinions. The statements that do contain factual assertions are not capable of sustaining a defamatory meaning. Finally, other statements were not published. Thus, for all of the reasons that Rushton is entitled to summary judgment on the defamation claim, she is also entitled to summary judgment on the defamation per se claim.

## IV.    FALSE LIGHT

Next, Nunes asserts a false light claim based upon the same online statements. "A prima facie case for false light requires a plaintiff to demonstrate that (1) the defendant publicized a matter concerning the plaintiff that placed the plaintiff before the public in a false light, (2) the

24

false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (3) the defendant knew or recklessly disregarded the falsity of the publicized matter and the false light in which the plaintiff was placed." *Jacob v. Bezzant*, 212 P.3d 535, 544 (Utah 2009).

A false light claim that is "predicated on publication of a defamatory statement" is subject to the same constitutional limitations as a defamation claim. *SIRQ, Inc. v. The Layton Companies, Inc.*, 379 P.3d 1237, 1245 (Utah 2016) (holding that the First Amendment requires a court to determine whether a statement is susceptible to a defamatory meaning when analyzing a false light claim); *Jacob*, 212 P.3d at 544 (noting that a "false light claim is closely allied with an action for defamation, and the same considerations apply to each" and disposing of defamation and false light claims on the same grounds, including that the statements were nonactionable opinions (citation omitted)); *see also Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005) ("In reaching an accommodation consistent with freedom of speech, defamation has accumulated a considerable assortment of defenses, privileges, heightened burdens of proof, and particularized standards of review. The concern that claims like false light invasion of privacy with close ties to defamation might be prosecuted free of the First Amendment safeguards present in defamation actions has drawn the attention of both the drafters of the Restatements and this court."). In other words, a false light claim based upon an allegedly defamatory statement is subject to the same constitutional protections afforded to expressions of opinion and to statements that are not capable of sustaining a defamatory meaning. Moreover, a false light claim, like a defamation claim, requires publication.

Thus, Nunes's false light claim fails for the same reasons that her defamation claim fails. The online comments were all protected opinions, not capable of sustaining a defamatory

meaning, or unpublished. Rushton, therefore, is entitled to summary judgment on the false light claim as well.

## V.    BUSINESS DISPARAGEMENT

Additionally, Nunes asserts a claim for business disparagement, also known as injurious falsehood. She alleges that the same online statements that support her defamation, defamation per se, and false light claims also damaged her business interests. In order for a plaintiff to recover on a business disparagement claim, she "must prove falsity of the statements made, malice, and special damages." *Direct Import Buyers Ass'n v. KSL, Inc.*, 538 P.2d 1040, 1042 (Utah 1975). A business disparagement claim "concerns statements regarding the quality of the plaintiff's product or the character of the plaintiff's business," and not "statements about an individual's reputation." *Watkins v. Gen. Refractories Co.*, 805 F. Supp. 911, 917 (D. Utah 1992); *accord Direct Import Buyers*, 538 P.2d at 1042 (holding that statements disparaging the quality of a plaintiff's product were properly analyzed under business disparagement rather than defamation).

Rushton disparaged the quality of Nunes's novels, giving them numerous one-star reviews and criticizing them for being "out of date" and "ridiculous." Because these negative reviews are statements of opinion that cannot be shown to be false, the first element of business disparagement cannot be proven. And to the extent that Nunes relies upon Rushton's other online comments to support her business disparagement claim, Nunes may not sidestep the constitutional limitations upon defamation claims by litigating liability for the statements under the auspices of a business disparagement claim. *Cf. SIRQ, Inc. v. The Layton Companies, Inc.*, 379 P.3d 1237, 1245 (Utah 2016) (constitutional limitations to defamations claims apply to false light claims); *Jacob v. Bezzant*, 212 P.3d 535, 544 (Utah 2009) (same); *Jensen v. Sawyers*, 130

P.3d 325, 336 (Utah 2005) (same). The court grants summary judgment in favor of Rushton on the business disparagement claim.

## VI.     TORTIOUS INTERFERENCE

Next, Nunes asserts a claim for tortious interference with business relations. "In order to win a tortious interference claim under Utah law, a plaintiff must . . . prove '(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff.'" *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015) (second alteration in original) (citation omitted). The improper means requirement "is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982). Nunes argues that Rushton interfered with her economic relations with the readers who purchase her books by way of two improper means: (1) posting defamatory comments on the internet and (2) infringing Nunes's copyright to *A Bid for Love*.

Nunes's tortious interference claim fails because she cannot satisfy the improper means element. First, Rushton's online comments were not contrary to law. As noted above, the comments did not breach any common-law rules creating liability for defamation, defamation per se, false light, or business disparagement. Because the comments were not improper, they cannot support a tortious interference claim.

Second, although Rushton's copyright infringement was contrary to law, to the extent that Nunes's tortious interference claim is based upon infringement, it is preempted by the Copyright Act. The Act states that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . and come within the

subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title." 17 U.S.C. § 301(a). Both prongs of this preemption test are satisfied. Nunes's book, *A Bid for Love*, is a literary work of authorship and thus within the scope of section 102(a). Moreover, the common law right to recover damages for intentional interference based upon copyright infringement is equivalent to the right "to prepare derivative works based upon the copyrighted work" described in section 106. Both an intentional interference claim and a copyright claim would seek the same damages for the same infringing conduct.

Preemption of a tortious interference claim based upon copyright infringement is widely recognized by the circuit courts. In *Ray v. ESPN, Inc.* the Eights Circuit affirmed a lower court's dismissal of a wrestler's claim for interference with prospective economic advantage against a network that aired the wrestler's past matches without his permission. 783 F.3d 1140, 1142–44 (8th Cir. 2015) (per curiam). In so doing, the court rejected the wrestler's "contention that his claim for interference with prospective economic advantage is uniquely beyond the preemptive scope of the Copyright Act." *Id.* at 1144 n.2. Other circuits have reached similar decisions. *Stromback v. New Line Cinema*, 384 F.3d 283, 306 (6th Cir. 2004) ("Generally, tortious interference claims (with contract or prospective economic advantage) are held to be preempted because the rights asserted in such claims are not qualitatively different from the rights protected by copyright."); *Harper & Row Publishers, Inc. v. Nation Enters*., 723 F.2d 195, 201 (2d Cir. 1983) *reversed on other grounds in* 471 U.S. 539 (1985) (holding that the Copyright Act preempted a tortious interference claim).

Because neither the internet posts nor Rushton's copyright infringement can satisfy the improper means element, the court grants summary judgment in favor of Rushton on the tortious interference with business relations claim.

## VII. ELECTRONIC COMMUNICATION HARASSMENT

Nunes also brings a claim for electronic communication harassment under Utah Code section 76-9-201. She alleges that Rushton's comments posted on Goodreads, Facebook, and GoFundMe violated this criminal statute, which provides:

> A person is guilty of electronic communication harassment and subject to prosecution . . . if with intent to intimidate, abuse, threaten, harass, frighten, or disrupt the electronic communications of another, the person . . . makes repeated contact by means of electronic communications, regardless of whether a conversation ensues . . . .

UTAH CODE § 76-9-201(2).[4] Nunes argues that the following provision of this statute creates a civil cause of action for violating the statute: "[C]riminal prosecution under this section does not affect an individual's right to bring a civil action for damages suffered as a result of the commission of any of the offenses under this section." *Id*. § 76-9-201(4)(a).

In order to prevail on a cause of action based upon this statute, Nunes must first demonstrate that Utah Code section 76-9-201 creates a civil cause of action. There is no express language in the statute authorizing civil claims. In the absence of an express grant of a private cause of action, a civil claim exists only if the language of Utah Code section 76-9-201 creates an implied right to sue.

"In Utah, '[i]n the absence of language expressly granting a private right of action[,] . . . the courts of this state are reluctant to imply a private right of action based on state law." *Buckner v. Kennard*, 99 P.3d 842, 853 (Utah 2004) (alterations in original) (citation omitted). Indeed, "Utah courts have rarely, if ever, found a Utah statute to grant an implied private right of

---

[4] In 2017, the Utah Legislature amended this statute. 2017 Utah Laws Ch. 462 (S.B. 118). But none of these amendments affect the statute's application in this case.

action." *Id.*; *see also id*. at 853 n.6 (listing numerous cases where Utah courts refused to recognize an implied private cause of action). In *Miller v. Weaver*, for example, the Utah Supreme court assessed an argument that the following statutory language created a civil claim:

> No civil action by or on behalf of a student relating to the professional competence or performance of a certified employee of a school district . . . may be brought in a court until at least 60 days after the filing of a written complaint with the board of education of the district, or until findings have been issued by the board after a fair hearing on the complaint, whichever is sooner.

66 P.3d 592, 598 (Utah 2003). The plaintiff in that case asserted that this language implied that students may sue individuals for a violation of any statute concerning the professional competence of school district employees. *Id.* The Utah Supreme Court rejected this argument, reasoning that the statute only fashioned procedural requirements for existing causes of action; it did not create a new claim. *Id.* at 598–99.

The statutory language at issue in this case similarly fails to meet the high bar for creating an implied cause of action. The electronic communication harassment statute provides that a criminal prosecution under the statute does not foreclose "a civil action for damages suffered as a result of the commission of any of the offenses under this section." UTAH CODE § 76-9-201(4)(a). This language does not impliedly create a new cause of action. The plain language of the statute confirms only that a criminal prosecution does not prevent the victim from bringing an existing civil claim—e.g., for intentional infliction of emotional distress or defamation—against the perpetrator.

Because Utah Code section 76-9-201 does not authorize a private cause of action, Nunes's claim for electronic communication harassment under this statute fails as a matter of law.

## VIII.   FALSE ADVERTISING UNDER FEDERAL LAW

Nunes seeks both money damages and injunctive relief for her false advertising claim under the Lanham Act, which provides:

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Nunes contends that Rushton violated this provision by using multiple sock puppet accounts to post positive reviews of her books and negative reviews of Nunes's books. Nunes argues that two aspects of the sock puppet reviews constitute false advertising. First, by pretending to be an independent reader of the books, Rushton deceived consumers both by obscuring her role as the source of the self-serving praise heaped upon her own books and by concealing the fact that the negative reviews of Nunes's books were written by a competing author. Second, by using several sock puppet accounts to post positive or negative reviews, Rushton misled consumers by creating the false impression that multiple individuals liked her books and disliked Nunes's books when, in fact, only one person held these opinions.

Both Rushton and Nunes moved for summary judgment on the false advertising claim, each arguing that she should prevail as a matter of law. The court grants summary judgment in favor of Rushton because (1) Nunes did not produce evidence of customer confusion and (2)

Nunes failed to produce any competent evidence of damages or unjust enrichment caused by Rushton's alleged false advertising.[5]

### A. Consumer Confusion

The plaintiff in a false advertising claim must prove:

> (1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.

*Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002) (citation omitted). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Zoller Labs., LLC v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (unpublished) (citation omitted). A literally false advertising claim "may be established without evidence of consumer deception." *Id*. "If, however, 'a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers.'" *Id*. (alteration in original).

---

[5] Because the court resolves the motions for summary judgment on other grounds, it need not address the issue of whether the use of multiple sock puppet accounts to express opinions about the quality of a novel may constitute a "false or misleading description of fact, or false or misleading representation of fact" under the Lanham Act. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08CV0442(DLC), 2016 WL 815205, at *8 (S.D.N.Y. Feb. 29, 2016) (concluding that online postings criticizing a business for slow service and rude employees under three separate pseudonyms were insufficient to establish Lanham Act liability because the postings were statements of opinion, not false statements of fact.).

Nunes does not present any consumer surveys, records of sales, or other extrinsic evidence that Rushton's positive reviews of her own books and negative reviews of Nunes's books caused actual consumer confusion regarding the characteristics or readership approval of the books. Because Nunes has not presented any evidence of actual consumer confusion, she can only prevail on her false advertising claim if Rushton's online reviews were literally false, either on their face or by necessary implication.

Literal falsity of online reviews was considered in *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08CV0442(DLC), 2016 WL 815205 (S.D.N.Y. Feb. 29, 2016). There, a hair removing business posted two types of online reviews about a competitor. One category of reviews involved fake bad experiences of non-existent customers. The court found that such statements were literally false because they described events that never occurred and fictitious customers that did not exist. *Id.* at *7. A second category of reviews were posted under three separate pseudonyms by an owner of a competing business who was an actual customer of the plaintiff. *Id.* at *8. These reviews asserted that the services was slow and that the plaintiff's employees were rude. *Id.* The court found that these reviews were not literally false because they were "largely matters of opinion and the plaintiff [had] not shown that they are actionable as false statements of fact." *Id.*

The reviews in this case align with the second category of *Romeo & Juliette* reviews rather than with the first. Rushton did not misrepresent the essential characteristics of the books she reviewed. Instead, she claimed that her books were good while Nunes's books were boring and outdated. Such statements are a matter of opinion and cannot be proven true or false. Accordingly, the court finds that Rushton's online reviews are not literally false on their face or by necessary implication. In the absence of a showing of the actual consumer confusion, Nunes's

false advertising claim for damages and injunctive relief under the Lanham Act cannot survive summary judgment.

### B. Damages

Independently, Nunes's claim for monetary damages under the Lanham Act cannot succeed because Nunes has failed to substantiate any damages suffered as a result of Rushton's online reviews. Evidence of damages is not required to obtain injunctive relief for false advertising. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989). But proof that the plaintiff has been injured is an essential element of a damages claim for false advertising. *Sally Beauty Co.*, 304 F.3d at 980; *see also Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 709 (Fed. Cir. 2005) ("[F]alse advertising under the Lanham Act requires, among other things, a showing of both an injury and a causal link between the injury and the allegedly false advertising."); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir. 1977) ("In order to recover damages for a section 1125(a) violation, the aggrieved party must show that it suffered actual harm to its business."). Additionally, if a plaintiff fails "to present evidence that the defendant benefitted from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits under 15 U.S.C. § 1117(a)." *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 465 (5th Cir. 2001). Thus, to recover damages for false advertising, Nunes is required to produce evidence that the online reviews either caused Rushton's book sales to increase or caused Nunes's book sales to decrease.

Nunes has not presented any evidence that Rushton wrongfully profited from her online reviews. Nunes instead claims that she has been harmed by the negative reviews and points to the testimony of her expert, Heather Moore, and the lay opinion of a representative of Amazon.com as evidence that she has been harmed. Moore testified that, in general, negative

34

online reviews negatively affect book sales. Moore admitted, however, that she did not analyze Nunes's book sales and that she did not know whether her sales went up or down after Rushton posted her reviews. Moore further admitted that she could not assign a monetary value to the effect online reviews may have and that her opinion regarding negative reviews was based on common sense. The Amazon.com representative provided his lay testimony that bad reviews generally discourage sales.

In essence, Nunes presented generic, common-sense evidence that negative online reviews typically inhibit sales. Nunes did not produce evidence as to the specific effect that Rushton's online reviews had on her books. No evidence was presented regarding sales during the relevant period of time. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (concluding that expert analysis of sales data before and after the alleged false advertising was admissible to prove damages). Nor did Nunes present evidence in the form of customer surveys or customer testimony. Absent specific evidence of any effect that Rushton's negative online reviews had on Nunes's book sales, there is no proof to support Nunes's damages claim for lost sales.

At the hearing on the summary judgment motions, Nunes also asserted that she is entitled to a damages award because the negative reviews caused her to experience mental anguish, which in turn prevented her from writing two books. Similar to her damages claim for copyright infringement, Nunes argues that she is entitled to the profits from these two unwritten books as false advertising damages. Once again, however, Nunes does not cite any authority for the proposition that the Lanham Act provides for damages stemming from a business competitor's mental anguish and anxiety caused by false advertising. Nor has the court discovered any caselaw to that effect. The court therefore concludes that there is no legal basis under the

Lanham Act for a damages claim based on Nunes's emotional reaction to the alleged false advertising.

In sum, Nunes has not presented evidence of lost book sales, and she cannot claim the profits from two unwritten books as damages. Without any evidence that she suffered a legally cognizable injury, Nunes's damages claim for false advertising fails as a matter of law. For this additional reason, Rushton is entitled to summary judgment on the damages claim for false advertising.

## IX.  DECEPTIVE TRADE PRACTICES UNDER UTAH LAW

Next, Nunes alleges that Rushton's positive reviews of her books and negative reviews of Nunes's books violate the Utah Truth in Advertising Act. Nunes contends that she is entitled to both injunctive relief and an award of damages under this Act. Both Nunes and Rushton move for summary judgment on this cause of action.

### A.  *Injunctive Relief*

The Utah Truth in Advertising Act provides that if a defendant has violated any of the provisions of the Act, a court "shall enjoin the defendant from continuance of the violation." UTAH CODE § 13-11a-4(2)(a). But this ostensibly mandatory injunction provision has an important caveat. The statute also provides:

> No action for injunctive relief may be brought for a violation of this chapter unless the complaining person first gives notice of the alleged violation to the prospective defendant and provides the prospective defendant an opportunity to promulgate a correction notice by the same media as the allegedly violating advertisement. If the prospective defendant does not promulgate a correction notice within 10 days of receipt of the notice, the complaining person may file a lawsuit under this chapter.

*Id.* § 13-11a-4(5). Absent this statutory notice, a plaintiff is not entitled to seek injunctive relief.[6] Nunes and Rushton dispute whether notice was given in this case.

Nunes argues that prelitigation emails that she sent to Rushton, both at her personal email account and to an email account Rushton maintained under her Sam Taylor Mullins pen name, satisfied the statutory notice requirement. At most, Nunes complains about plagiarism and copyright infringement in these emails. Nunes also asserts that a blog post on her website provided the required notice. In the blog post, Nunes accuses an unnamed individual behind the Sam Taylor Mullins pen name of copyright infringement. The blog post also posits that the unnamed infringer posted negative reviews of Nunes's books through sock puppet accounts. Nunes argues that Rushton must have read the blog post because she wrote a comment to the post.

The prelitigation emails and blog post fall far below the notice requirements of Utah Code section 13-11a-4(5), which requires a prospective plaintiff to "gives notice of the alleged violation [of the Utah Truth in Advertising Act] to the prospective defendant" and to provide "the prospective defendant an opportunity to promulgate a correction notice by the same media as the allegedly violating advertisement." Neither the emails not the blog post mention the Act or allege

---

[6] Citing *Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1555–56 (D. Utah 1996), Rushton argues that a failure to provide the statutory notice is also fatal to a claim for damages under the Act. The *Proctor & Gamble* court concluded that the language of Utah Code section 13-11a-4, taken as a whole, requires potential plaintiffs to provide notice before filing a suit for either injunctive relief or damages. This court disagrees with this interpretation of the Utah Truth in Advertising Act. The plain language of section 13-11a-4(5) creates a notice requirement only for an "action for injunctive relief." Reading this provision to require notice before suing for either injunctive relief or damages would turn the plain language of the statute on its head. *See In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig.*, No. ML 12-2317 CAS (JEMx), 2012 WL 6062047, at *16 n.7 (C.D. Cal. Dec. 3, 2012) (disagreeing with the *Proctor & Gamble* interpretation of Utah Code section 13-11a-4(5) and ruling that this notice provision applies only to claims for injunctive relief).

any violation of the Act. Nor do these communications ever notify Rushton that she must post a correction notice in order to avoid an injunctive relief action under the Act. Because Nunes did not issue a valid statutory notice, she cannot prevail on an action for injunctive relief under the Utah Truth in Advertising Act.

### B. Damages

"Any person . . . may maintain an action to enjoin a continuance of any act in violation of [the Utah Truth in Advertising Act] and, *if injured by the act*, for the recovery of damages." UTAH CODE § 13-11a-4(2)(a) (emphasis added). Accordingly, while any person can seek an injunction for a violation of the Act, only those who have been injured are entitled to damages.

Because Nunes has no proof of injury, she cannot recover damages under the Act. Nunes's claim under the Utah Truth in Advertising Act arises from the same online reviews as the Lanham Act claim. The court has already determined that Nunes failed to produce any evidence that these online reviews harmed her economically. And, once again, Nunes has not provided any authority or argument for the proposition that the Utah Act permits recovery of damages caused by a competitor's emotional response to false advertisements. Therefore, Rushton is entitled to summary judgment on the damages claim under the Act because Nunes has not produced evidence that she suffered a legally cognizable injury.

### X.    AFFIRMAIVE DEFENSES

Rushton asserted a number of affirmative defenses in her answer to the complaint. Nunes brings two motions for summary judgment on these defenses.

### A. The "Insanity Defense"

First, Nunes brings a motion regarding what she labels as Rushton's insanity defense. Nunes requests two forms of relief. She (1) asks the court to grant summary judgment on the

insanity defense and (2) requests that the court exclude evidence that Rushton suffers from bipolar disorder and that her actions of copying elements of *A Bid for Love* can be attributed to a manic phase of this disorder. Nunes argues that this evidence should not be considered when determining whether Rushton's infringement was "willful" within the meaning of the Copyright Act.

To the extent that this motion seeks summary judgment on an affirmative defense, it is denied. Rushton did not plead anything akin to an insanity affirmative defense. Thus, there is no affirmative defense at issue in this case that can be summarily adjudicated.

To the extent that the motion requests exclusion of evidence of any diagnosis of bipolar disorder, the motion is premature. The exclusion or admission of this evidence does not affect the court's determination that summary judgment on the willfulness of Rushton's copyright infringement is improper. Even if the evidence were excluded, there would be a genuine dispute of material fact as to whether Rushton's infringement was willful. *See supra* Part I.A.2. The court, therefore, denies the motion in limine as premature. Nunes may reassert her request to exclude the evidence in a pretrial motion.

### B. *Rushton's Other Affirmative Defenses*

Nunes brings a separate motion for summary judgment on Rushton's affirmative defenses of comparative fault, estoppel, laches, unclean hands,[7] and failure to mitigate damages.

---

[7] Rushton pleaded unclean hands and bad faith as separate affirmative defenses. But at oral argument, her counsel stated that the bad faith defense was identical to the unclean hands defense. The court, therefore, addresses both defenses under the term "unclean hands."

Rushton does not contest the motion to the extent that it seeks summary judgment on the comparative fault, estoppel, and laches affirmative defenses. The court, therefore, grants summary judgment as to these defenses.

Next, Nunes asks for summary judgment on Rushton's unclean hands defense. Unclean hands may be asserted only as a defense to equitable claims; it is not a defense to legal claims. *Hill v. Estate of Allred*, 216 P.3d 929, 935 (Utah 2009). None of Nunes's equitable claims for injunctive relief remain in the case. Because the unclean hands defense is inapplicable to the remaining claim for statutory damages for copyright infringement, the court grants summary judgment as to the unclean hands defense.

Finally, Nunes moves for summary judgment on Rushton's failure to mitigate damages affirmative defense. Under this defense, Rushton argues that Nunes failed to mitigate her actual damages for copyright infringement during the period of time where Nunes stopped writing. The court, however, has granted summary judgment on the copyright actual damages claim, leaving only a claim for statutory damages. Failure to mitigate is not a valid defense to statutory damages. *Moothart v. Bell*, 21 F.3d 1499, 1506–07 (10th Cir. 1994) (holding that a failure to mitigate defense did not apply to a statutory penalty for violating ERISA); *Purzel Video GmbH v. St. Pierre*, 10 F. Supp. 3d 1158, 1169 (D. Colo. 2014) ("A copyright plaintiff's exclusive pursuit of statutory damages invalidates a failure-to-mitigate defense."); *Malibu Media, LLC v. Yamaguchi*, No. 13-CV-02781-WYD-MEH, 2014 WL 2021973, at *4 (D. Colo. May 16, 2014) (same). Because Rushton cannot prevail on her failure to mitigate defense, the court grants summary judgment in favor of Nunes on this defense as well.

## XI.    RUSHTON'S MOTIONS IN LIMINE

Rushton filed a number of motions in limine to exclude various categories of evidence. Rushton moves to exclude the testimony of Heather Moore, Nunes's damages expert; Scott Bosworth, another damages expert; Josi Kilpack, a copyright infringement expert; and Bruce Webster, a forensic computer investigator. Rushton also moves the court to exclude the testimony of Heather Moore and Josi Kilpack as a sanction for allegedly violating a protective order.

None of the testimony that Rushton seeks to exclude is relevant to the motions for summary judgment filed by the parties in this case. As noted above, the court grants summary judgment on many of the claims brought by Nunes for reasons that are unrelated to the testimony proffered by these experts. The court, therefore, denies these motions as moot. If Nunes intends to introduce any of this evidence at the trial on statutory copyright infringement damages, Rushton may renew any of her motions in limine prior to trial.

## CONCLUSION

For the forgoing reasons, the court ORDERS as follows:

(1) The court GRANTS Rushton's motion for summary judgment. [Docket 172]. The court grants judgment in favor of Rushton on Nunes's claim for actual damages for copyright infringement, as well as Nunes's causes of action for defamation, defamation per se, false light, business disparagement, tortious interference, electronic communication harassment, false advertising, and deceptive trade practices.

(2) The court GRANTS IN PART AND DENIES IN PART Nunes's motion for summary judgment on the copyright infringement claim. [Docket 218]. The court grants partial summary judgment on the issue of Rushton's liability for this cause of action.

41

(3) The court DENIES Nunes's motion for summary judgment on the defamation claims. [Docket 228].

(4) The court DENIES Nunes's motion for summary judgment on the electronic communication harassment claim. [Docket 229].

(5) The court DENIES Nunes's motion for summary judgment on the false advertising claims. [Docket 230].

(6) The court DENIES Nunes's motion for summary judgment on the tortious interference claim. [Docket 231].

(7) The court DENIES Nunes's motion for summary judgment on what it labels as Rushton's insanity defense. [Docket 160].

(8) The court GRANTS Nunes's motion for summary judgment on Rushton's affirmative defenses of comparative fault, estoppel, laches, unclean hands, and failure to mitigate damages. [Docket 161].

(9) The court DENIES AS MOOT Rushton's motion in limine to exclude the testimony of Bruce Webster. [Docket 159].

(10) The court DENIES AS MOOT Rushton's motion in limine to exclude the testimony of Josi Kilpack. [Docket 168].

(11) The court DENIES AS MOOT Rushton's motion in limine to exclude the testimony of Heather Moore. [Docket 169].

(12) The court DENIES AS MOOT Rushton's motion in limine to exclude the testimony of Heather Moore and Josi Kilpack for violations of a protective order. [Docket 170].

(13) The court DENIES AS MOOT Rushton's motion in limine to exclude the testimony of Scott Bosworth. [Docket 171].

The only issues that remain for trial are (1) whether Rushton's copyright infringement was willful and (2) the amount of the statutory damage award.

Signed March 9, 2018.

BY THE COURT

Jill N. Parrish
United States District Court Judge